UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK                          Honorable
------------------------------------------------------------------X  Joan M. Azrack, USDJ
ANTHONY LUPO,

                Plaintiff,                **AMENDED COMPLAINT**

     -against-                                                       15 Civ-2426


ZWANGER & PESIRI RADIOLOGY GROUP, LLP
and ZWANGER RADIOLOGY, P.C.

               Defendants.
------------------------------------------------------------------X


## STATEMENT OF PLAINTIFF'S CLAIMS

1. Plaintiff filed the Original Complaint in this action alleging that Defendants violated his rights under Americans with Disabilities Act, 42 U.S.C. Section 12182 et seq. and 42 U.S.C. Section 12204 et seq. (hereinafter, "ADA"); the Rehabilitation Act of 1973, as Amended, 29 U.S.C. § 794, and the New York State Executive Law § 296 (hereinafter, "Human Rights Law"), when on March 12, 2015 he was subjected to unlawful discrimination because of Defendants' failures to provide him with an equal opportunity to access to their radiological services and equipment when he sought an ultrasound examination at Defendants facility located at 2500 Nesconset Highway, Building 15, Stony Brook, NY 11790 (hereinafter, "Premises 1").

2. Although Defendants were duly served with the Summons and Complaint on May 12, 2015, no Answer or appearance has been filed by either Defendant to date.

1

3. This Amended Complaint is filed as a Matter of Course pursuant to Fed.R.Civ.P. 15(a)(1) because Plaintiff was subjected to virtually the same discriminatory treatment by Defendants on June 18, 2015 at Defendants facility located at 220 Belle Meade Road, East Setauket, New York (hereinafter, "Premises 2").

4. Plaintiff seeks declaratory and injunctive relief, compensatory damages, and attorney's fees and costs against the Defendants.

## PARTIES

5. Plaintiff ANTHONY LUPO (hereinafter, "LUPO") is a resident of Centereach in Suffolk County, New York.  He is an individual with a disability called Cerebral Palsy.  As a result of his disability, the Plaintiff cannot walk and uses a motorized wheelchair to assist in his mobility.

6. Defendant ZWANGER & PESIRI RADIOLOGY GROUP, LLP is an active domestic registered limited liability partnership duly organized and existing under and by virtue of the laws of the State of New York.

7. Upon information and belief, Defendant ZWANGER & PESIRI RADIOLOGY GROUP, LLP provides radiology services at approximately 17 offices in Nassau and Suffolk Counties, including Premises 1 and Premises 2.

8. Defendant ZWANGER RADIOLOGY, P.C. is an active domestic professional corporation duly organized and existing under and by virtue of the laws of the State of New York.

9. Upon information and belief, Defendants ZWANGER & PESIRI RADIOLOGY GROUP, LLP and ZWANGER RADIOLOGY, P.C. (collectively, hereinafter

"ZWANGER") provide radiology services to the general public at Defendants' 17 facilities.

## VENUE AND JURISDICTION

10. This Court has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 2201 and through the ADA.

11. This Court has venue through the residence of the Plaintiff and the business activities of the Defendants in Suffolk County, New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

12. Plaintiff is 54 years of age. He cannot bear any weight at all on his legs and has very limited use of his upper extremities. Consequently, he cannot transfer independently from his wheelchair to any type of medical table or equipment intended to contain his body during an examination.

13. At various times when Plaintiff has gone to hospitals for examination or treatment which occurs on a table or bed, the table or bed is typically adjustable in height which permits it to be brought down to the approximate height of Plaintiff's wheelchair seat, whereupon a transfer to the table or bed can be accomplished by a single nurse or medical technician.

14. While non-hospital medical facilities used by Plaintiff often do not have adjustable examination tables for Plaintiff's use during examinations, they typically provided other equipment or devices that assisted Plaintiff in transferring to an examination table, or provided employees who were adequately trained to carry Plaintiff onto an examination tables.

15. Plaintiff has been using services provided by Defendants since 2007.

16. According to Defendants' website, they use diagnostic tables and equipment in their facilities which are comparable or better than similar tables or equipment used by most area hospitals as well as competitor radiological facilities.

17. According to that same website, Defendants strive to surpass every hospital, health system, multi-specialty practice and radiology practice in Long Island in virtually every facet of radiology.

18. Defendants update themselves on advances in radiological medical equipment and technologies, including diagnostic examination tables, and ensure that such equipment is replaced at a rate which will maintain their corporate goal to practice radiology in a manner that surpasses all other providers in Long Island.

19. As alleged in this Amended Complaint, Defendants corporate promises exclude Plaintiff and other individuals with severe disabilities who require assistance getting onto and off of examination tables.

20. Defendants own and/or operate the Zwanger-Pesiri Radiology facilities located at Premises 1 and Premises 2.

21. Premises 1 was constructed and first occupied by Defendants after January 26, 1993.

22. Premises 2 was constructed and first occupied by Defendants after January 26, 1993.

23. Defendants opened their offices at Premises 1 on or about January 2012.

24. Defendants opened their offices at Premises 2 between 2004 and 2007.

25. Upon information and belief, Premises 1 and Premises 2 were altered for Defendants' use as a radiological diagnostic medical services facility after January 26, 1993.

26. Premises 1 and Premises 2 complained of herein are places of public accommodation within the definition of that term provided in 28 C.F.R. Section 36.104.

27. In preparation for opening their offices at Premises 1 and Premises 2 Defendants purchased new radiology diagnostic equipment, including new sonogram tables.

28. The radiology diagnostic equipment purchased by Defendants for use in Premises 1 and Premises 2 are intended for continuous, permanent use in the Premises until the equipment is no longer functional or current.

29. Defendants provide a wide array of radiology services including MRI, CT, PET, Mammography and ultrasound (sonogram) services.

30. Many of Defendants' radiology services are provided while patients lie down in a prone or supine position on tables designed for use with radiological equipment.

31. In the event that some of the radiology equipment and related tables used in the Premises 1 and Premises 2 were not newly purchased when the Defendants first occupied the Premises for business, all such equipment and tables were purchased new after January 26, 1993.

32. Examination tables and radiological equipment are equipment and personal property purchased for use by the public and fall within the definition of "facility" as that term is defined in 28 C.F.R. Section 36.104 : "*Facility* means all

or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."

33. Accessible (adjustable) sonogram tables are commercially available for sale by multiple vendors of sonogram medical equipment. A simple internet search will provide options, features and pricing for multiple vendors of sonogram tables which includes height adjustable models.

**March 12, 2015 Incident**:

34. On March 12, 2015, the Plaintiff went to Premises 1 for a sonogram.

35. Plaintiff arrived at the Premises with a personal care aide. He was escorted into the sonogram machine room where there was a sonogram table. Plaintiff asked an employee of the Defendants if the table could be adjusted in height to the approximate level of his wheelchair seat to facilitate his transfer onto and off of the table.

36. Plaintiff was told that height of the sonogram table could not be adjusted.

37. The sonogram table appeared to Plaintiff to be approximately 36 inches above the floor.

38. Plaintiff's wheelchair seat is approximately 18 inches above the floor.

39. LUPO asked an employee of ZWANGER if they had another table that could be lowered to the desired height.

40. The employee responded, "No."

6

41. Plaintiff then asked whether the Defendants would provide assistance getting onto and off of the table from his wheelchair.

42. Defendant's employee did not provide a response to this request.

43. Plaintiff could not get onto or off of the table without assistance.

44. When no adjustable table is provided to facilitate Plaintiff's transfer onto the table, a medical facility would have to provide other assistive devices such as Hoyer lifts, adjustable Stryker beds or stretchers which could achieve the same result.

45. If no adjustable bed or assistive device is provided, then transfer is much more difficult and more dangerous to the Plaintiff and to persons performing the transfer. Transfer without an adjustable table or assistive device should be accomplished by two persons trained in lifting deadweight who would lift the Plaintiff's entire body out of his wheelchair, carry his body over to the table, lift his lower body up onto the table, and then position him prone or supine on the table. When the test is completed the transfer is reversed.

46. If the table were adjustable, Plaintiff would merely have to align his chair alongside and parallel to the table and then slide his body off of his chair onto the table with minimal assistance.

47. When met with silence from Defendants nurse to his request for assistance transferring onto the sonogram table, Plaintiff concluded that Defendants could not or would not provide him with assistance getting onto the sonogram table. In light of the fact that cancellation of the examination would not be in his best

medical interest, Plaintiff reluctantly asked his personal care aide to perform the transfer by himself.

48. Plaintiff's personal care aide on that day was a very large and strong man who had assisted Plaintiff before in such transfers when no other means were available. Despite the aide's size and training in performing such transfers a heightened risk of injury to both the Plaintiff and his aide existed from such a transfer. If the aide dropped the Plaintiff in the course of such a transfer he could sustain severe personal injury or even death. The aide could also sustain back or joint injury.

49. The risk of injury to Plaintiff and the aide are reasons why the entity who pays Plaintiff's personal care aide has instructed him not to attempt such transfers except in the case of an emergency.

50. Plaintiff's personal care aide successfully lifted Plaintiff onto and off of the sonogram table.

**June 18, 2015 Incident**:

51. Plaintiff's physician scheduled an MRI for him at Premises 2 on June 18, 2015 to check for possibility of a blood clot in one of Plaintiff's lungs.

52. When Plaintiff arrived he was escorted quickly into the sonogram room. He saw a table very similar to the sonogram table present at Premises 1 on March 12, 2015. He learned quickly that the sonogram table in Premises 2 was also not adjustable.

53. Plaintiff asked a sonogram nurse or technician employed at Premises 2 if the sonogram test could be performed while Plaintiff sat in his wheelchair. Plaintiff

was informed that the test could not adequately be performed while he sat in his chair.

54. The nurse/technician said that Plaintiff would have to get onto the sonogram table and then asked Plaintiff's aide if he could transfer Plaintiff to the table.

55. Plaintiff replied that his aide was not supposed to pick him up and carry him onto the sonogram table. Plaintiff then asked the nurse/technician if she could get some help to transfer him onto the sonogram table.

56. The nurse/technician left and returned with two men. Upon information and belief, these men were employees of Defendants.

57. One of the men asked Plaintiff "How much weight can you bear?"

58. Plaintiff replied that he could not bear any weight on his legs.

59. The man then asked Plaintiff "What can you do?"

60. Plaintiff replied that there was not much he could do to help the two men.

61. Plaintiff then expected the two men to tell him how they would accomplish the transfer. Instead he was met with awkward silence from the men.

62. It became apparent that the men were uncomfortable attempting to transfer the Plaintiff to the sonogram table and were obviously not trained adequately in how to accomplish a transfer of patients with no ability to assist in their own transfer (deadweight transfer).

63. At this point Plaintiff did not feel safe permitting the two men to transfer him onto and off of the sonogram table. He asked his personal care aide to perform the transfer rather than return home to re-schedule the sonogram test at a facility

9

with an adjustable table, alternate auxiliary assistive devices, or willing and adequately trained employees who could perform the necessary transfers.

64. It would not have been in Plaintiff's best medical interest to delay performance of the sonogram test.

65. The aide who assisted Plaintiff on June 18, 2015 was the same aide who accompanied him on March 12, 2015.

66. Plaintiff's other personal care aides do not possess the physical strength of the aide who accompanied Plaintiff on March 12, 2015 and June 18, 2015, and could not have safely transferred him from his wheelchair to the sonogram table.

67. Plaintiff experienced humiliation and anger, cumulatively, as a result of the Defendants' repeated failures to accommodate his disability. The humiliation and anger was made more acute by the fact that Plaintiff had previously filed a similar complaint against the Defendants arising out of an incident in 2007 at Premises 2 which resulted in an agreement by Defendants to provide non-discriminatory treatment to individuals with disabilities, assistance in transferring, and proper training to employees to achieve those promises.

68. Unlike other patients who use Defendants' radiological services and do not have disabilities, Plaintiff and his personal care aide were subjected to a risk of serious injury just to obtain a needed diagnostic test. Plaintiff's only other choice would have been to return home without having the needed test performed.

69. Upon information and belief, all manufacturers of tables used in conjunction with radiological equipment provide models that are adjustable in height which

10

are designed to accommodate individuals who use wheelchairs or who are small in stature.

70. Adjustable tables have been available commercially for many years.

71. Prior to the advent of height adjustable examination tables, physicians and medical providers used Hoyer lifts or other auxiliary assistive devices and/or employees trained in lifting patients with disabilities.

72. The accommodations requested by the Plaintiff from Defendants were therefore reasonable.

## AS AND FOR A FIRST CAUSE OF ACTION UNDER TITLE III OF THE ADA

73. Plaintiff repeats and re-alleges paragraphs one (1) through seventy-two (72) and incorporates same herein as if fully set forth.

74. The failure to provide height adjustable examination tables for use with radiological examinations is an example of a violation by Defendants of the barrier removal obligation placed upon the Defendants by Title III of the ADA in order to permit equivalent access by the Plaintiff and other individuals with disabilities to the radiological facilities provided by the Defendants to the general public. 42 U.S.C. § 12182(b)(2)(A)(iv); 28 C.F.R. § 36.304(a) and 28 C.F.R. § 36.304(b)(4).

75. Defendants also had an obligation to install new facilities, including newly purchased medical equipment necessary for the performance of medical services, for all facilities newly constructed after January 26, 1993 and new equipment purchased after January 26, 1993 provided that procurement and installation of

the new equipment is not structurally impracticable. 42 U.S.C. § 12183(a)(1); 28 C.F.R. § 36.401.

76. Defendants also had an affirmative obligation to provide the Plaintiff and other similarly situated individuals with disabilities with auxiliary aids and services adjunct to the use of radiological diagnostic equipment, where necessary to avoid providing unequal access to Defendants' radiological services. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(a) and 28 C.F.R. § 36.303(b)(3),(4).

77. A height adjustable examination table is an example of an aid auxiliary to the use of the sonogram diagnostic equipment that was readily available to the Defendants.

78. Defendants also had an obligation under 42 U.S.C. § 12182(b)(2)(A)(v); 28 C.F.R. § 36.305 to provide alternatives to the removal of barriers to access to its facilities not capable of redress by any of the foregoing sections of Title III of the ADA. An example of an alternative to barrier removal would be the use of a Hoyer lift or other auxiliary assistive device by employees of the Defendant.

79. Defendants' failures to comply with Title III of the ADA as set forth above constitute discrimination against the Plaintiff in violation of 42 U.S.C. § 12182(a); 42 U.S.C. § 12182(b)(1)(A)(iii); 42 U.S.C. § 12182(b)(1)(A)(iv); 42 U.S.C. § 12182(b)(1)(A)(v) and 42 U.S.C. § 12183(a).

80. Title III of the ADA has been in effect since 1992. Defendants actually knew they were obligated to comply with Title III by ensuring the provision of accessible radiology services to the Plaintiff and other individuals with disabilities at least since 2008 when the Plaintiff previously complained about

their failure to provide him with accessible radiology services. Defendants' violations of the ADA are therefore knowing and intentional.

81. The Plaintiff is highly likely to require radiology services again in the future. The Plaintiff will seek such services in the first instance from the Defendants because of the proximity of Premises 1 and Premises 2 to Plaintiff's home and because of the vast array of high quality radiology diagnostic equipment provided at Defendants' radiology facilities.

82. Plaintiff is entitled to declaratory and injunctive relief, and attorney's fees and costs for Defendants' violations of Title III of the ADA. Such relief is appropriate and necessary to ensure that Defendants will not continue to violate Plaintiff's rights under Title III of the ADA in the future.

### FOR A SECOND CAUSE OF ACTION UNDER THE REHABILITATION ACT OF 1973, AS AMENDED

83. Plaintiff repeats and re-alleges paragraphs one (1) through eighty-two (82) and incorporates same herein as if fully set forth herein.

84. Plaintiff is a recipient of Medicaid insurance which pays for all of his medical treatment, including the sonogram examinations performed by Defendants on March 12, 1015 and June 18, 2015.

85. Medicaid is a federal health welfare program administered with federal and state funds which provides health care and medical treatment for individuals who are indigent and/or suffer from severe, chronic disabilities.

86. Upon information and belief, Defendants billed Medicaid for Plaintiff's sonograms and received payment for same by Plaintiff's Medicaid Health Maintenance Organization.

87. Defendants receive Medicaid funds for radiological services and are therefore "recipients" of "federal financial assistance" as those terms are defined in 45 C.F.R. §§ 84.3(f) and (h).

88. The Rehabilitation Act of 1973, As Amended, 29 U.S.C. § 794 (hereinafter, "Rehabilitation Act"), requires recipients of federal financial assistance or payments to refrain from discrimination against the Plaintiff and other individuals with disabilities on the basis of disability.

89. The Rehabilitation Act requires new and existing facilities to be accessible to individuals with disabilities. The Rehabilitation Act also requires alternatives to the removal of physical barriers in facilities and the provision of auxiliary aids and services.

90. The Rehabilitation Act provisions at issue in this case will be interpreted in tandem with correspondent sections of Title III of the ADA at issue in this case.

91. On March 12, 2015 and again on June 18, 2015, Defendants and their employees were deliberately indifferent to Plaintiff's medical and safety needs in the receipt of sonogram radiological services, and his right to be treated equally with respect to non-disabled individuals.

92. Plaintiff is entitled to compensatory damages, declaratory and injunctive relief, and attorney's fees and costs for Defendants' violations of the Rehabilitation Act. Such relief is appropriate and necessary to redress the repeated, recalcitrant discrimination experienced by the Plaintiff and to ensure that Defendants will not continue to violate Plaintiff's rights under the Rehabilitation Act in the future.

## FOR A THIRD CAUSE OF ACTION UNDER THE
## NEW YORK STATE HUMAN RIGHT LAW

93. Plaintiff repeats and re-alleges paragraphs one (1) through ninety-two (92) and incorporates same herein as if fully set forth.

94. The Human Rights Law provides equivalent or greater civil rights protections for persons with disabilities than are provided by Title III of the ADA, including the right to compensatory damages.

95. Defendants discriminated against the Plaintiff in violation of the Human Rights Law by their failure to provide a height adjustable table for use with Plaintiff's sonogram test, or to provide alternatives to removal of barriers to Plaintiff's ability to undergo a sonogram at Defendants facilities that would have permitted the Plaintiff to have an equal opportunity to access Defendants' radiology services.

96. Plaintiff is entitled to compensatory damages, declaratory and injunctive relief, and attorney's fees and costs for Defendants' violations of the New York State Human Rights Law. Such relief is appropriate and necessary to redress the discrimination experienced by the Plaintiff and to ensure that Defendants will not continue to violate Plaintiff's rights under the Human Rights Law in the future.

## INJUNCTIVE RELIEF

97. Injunctive relief is necessary to order the Defendants to cease their violations of Plaintiff's rights under the ADA, Rehabilitation Act and New York State Human Rights and to provide Plaintiff with specific relief to prevent further violations of Plaintiff's rights.

98. There are reasonable grounds, set forth above, to believe that the Defendants will continue to engage in acts and practices prohibited by the foregoing federal and state laws complained of herein if injunctive relief is not granted.

## DECLARATORY RELIEF

99. Plaintiff is entitled to a declaratory judgment specifying each of the Plaintiff's rights under the ADA, Rehabilitation Act and New York State Human Rights Law pertaining to violations of those federal and state laws committed by the Defendants and each of the Plaintiff's rights to relief as against the Defendants.

## DAMAGES

100. Plaintiff requests FIFTY THOUSAND DOLLARS ($50,000.00) in compensatory damages for Defendant's violations of Plaintiff's rights under the Rehabilitation Act and the New York State Human Rights Law.

## ATTORNEY'S FEES AND COSTS

101. Plaintiff had to retain counsel in order to enforce his rights under the ADA, Rehabilitation Act and New York State Human Rights Law. The undersigned counsel is entitled to recover attorney's fees, costs and expenses if the Plaintiff prevails within the meaning of 42 U.S.C. § 12204 in this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief from the Court:

A. Issue a permanent injunction against Defendants, requiring Defendants and their agents, servants and employees, and all persons or entities in active concert therewith, to make all necessary modifications to Defendants' facilities, equipment, policies and practices necessary to

           eliminate all barriers that deny lawful access by Plaintiff to Defendants' Premises and to the radiology services provided thereat.

B.     Enter declaratory judgment in favor of the Plaintiff specifying his rights under the ADA, Rehabilitation Act and New York State Human Rights Law as against Defendants and Defendants' violations of the ADA, Rehabilitation Act and New York State Human Rights Law.

C.     Award compensatory damages in the amount of FIFTY THOUSAND DOLLARS ($50,000.00) to Plaintiff.

D.     Find that Plaintiff is a prevailing party in this lawsuit and award attorney's fees, costs and expenses, and such other and further relief, at law or in equity, to which the Plaintiff may be justly entitled.

Dated:     Woodbury, New York  
           July 1, 2015

/s/  
_____  
Martin J. Coleman, Esq. (MJC 7945)  
Attorney for Plaintiff  
100 Crossways Park West, Suite 412  
Woodbury, New York 11797  
(516) 802-5960